NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0985-17T3

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

HASSAN A. REID,

    Defendant-Respondent.

_____

> APPROVED FOR PUBLICATION
>
> **August 15, 2018**
>
> **APPELLATE DIVISION**

Argued July 31, 2018 — Decided August 15, 2018

Before Judges Sabatino, Mayer and Mawla.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 14-02-0224 and 14-02-0234.

Nancy A. Hulett, Assistant Prosecutor, argued the cause for appellant (Andrew C. Carey, Middlesex County Prosecutor, attorney; Nancy A. Hulett, of counsel and on the briefs).

Peter T. Blum, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Peter T. Blum, of counsel and on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

The State appeals the trial court's dismissal of two Middlesex County indictments charging defendant Hassan A. Reid

with committing an armed robbery in Perth Amboy, conspiracy, and firearms possessory offenses. The court dismissed those charges because defendant had already pled guilty and been convicted in Monmouth County to having illegally possessed firearms in Asbury Park, weapons that were confiscated after the robbery in Perth Amboy occurred.

In particular, the victim of the robbery identified defendant as having brandished a silver or gray handgun. Another witness to the robbery told police that she saw defendant wearing a shoulder holster at some unspecified point in time. Five days after the robbery, police officers executed a warrant for defendant's arrest issued by a judge in Middlesex County. The officers found defendant in a home in Monmouth County, along with two guns, one of which was silver or gray in color, and a shoulder holster.

The trial court reasoned that the Monmouth County and Middlesex County charges were sufficiently related to require them to be pursued in a single coordinated prosecution. Consequently, the court ruled the State's failure to combine the charges before the entry of the judgment of conviction in Monmouth barred his later prosecution in Middlesex.

The issues before us concern principles of mandatory joinder, double jeopardy, and continuing offenses. Applying

those principles, we partially affirm the trial court's dismissal order with modification, reverse the order in part, and remand the matter for trial on certain counts of the indictments in Middlesex County. More specifically, and subject to certain caveats detailed in this opinion, the Middlesex prosecution on the armed robbery and conspiracy-to-rob counts is reinstated, but the weapons possession counts remain dismissed.

## I.

Although the proofs have not been developed or tested at a jury trial, the existing record reveals the following factual contentions and relevant procedural history.

### The Armed Robbery in Perth Amboy

On June 30, 2013, H.B.[1] was walking to a friend's house located on Convery Boulevard in Perth Amboy (Middlesex County). According to H.B., as he approached the house, a "grayish" Honda Civic pulled up and blocked his path. The front seat passenger got out of the Honda and asked H.B. if he lived at the location. H.B. responded in the affirmative, even though he did not actually reside there.

In his testimony at a pretrial hearing in Middlesex County, H.B. described the front seat passenger as a light-skinned

---

[1] We use initials for the robbery victim, as there is no necessity to identify him by his full name in this opinion.

African-American man with a beard, who was wearing a red hoodie and khaki pants. H.B. testified that the front seat passenger then "reached under his hoodie and pulled a gun[2] and cocked it and said, you know — you know what this is." H.B. identified defendant as the front seat passenger who had initially brandished a gun.

H.B. recounted that another man then hopped out of the back passenger side of the Honda. The second man "put another gun in [H.B.'s] face and told [him] to get on the car." H.B. described the back seat passenger as wearing a polo shirt with stripes and a baseball cap pulled down low. Because this second assailant had positioned himself behind H.B., H.B. could not get a good look at the man's face. The second man then went through H.B.'s pockets and took $20 in cash as well as H.B.'s car keys. According to H.B., while he was pushed up against the car, he noticed a third person — a woman — sitting in the driver's seat.

H.B. testified that after he was robbed, the first assailant, identified as defendant, told him to run, and motioned with his gun towards a nearby gas station. After running to the gas station, H.B. tried without success to

---

[2] H.B. described the gun as "gray" and "automatic," stating that it "wasn't a revolver . . . ."

persuade the attendant to allow him to use the attendant's phone.

At that point, H.B. looked to see if the Honda was gone. He did not see the vehicle, so he returned to his friend's house. When he returned to the house, H.B. saw that his friend, his friend's girlfriend, and the friend's upstairs neighbor, Lisa Reid, were outside. He told them he had just been robbed.

According to H.B., after he described the robbery, Reid repeatedly said words to the effect that she could not believe defendant would do such a thing in front of her home. H.B. told Reid that if she could get his car keys back for him, he would not call the police. On the other hand, H.B. told her that if he did not get the keys, he would call the police.

Reid[3] tried to call defendant on her cell phone, but she was unable to reach him. After waiting approximately twenty minutes, H.B. called the police. Police officers then arrived at the scene.

H.B. was interviewed there by Officer Jose Santiago of the Perth Amboy Police Department. He told Santiago he had been robbed by two suspects brandishing guns and that a third suspect was a female driver.

---

[3] Reid apparently did not testify in the grand jury or in either the Middlesex or Monmouth court proceedings.

Officer Santiago then spoke to Reid, who identified herself as defendant's aunt. According to Santiago, Reid told him she had witnessed the robbery and that her nephew was one of the robbers. Reid[4] also reportedly told Santiago that she had seen defendant wearing a shoulder holster at some point in time. Santiago testified that he observed Reid attempt to call defendant. He recalled Reid left a voicemail for defendant effectively saying, "bring that stuff back . . . ."

Since defendant was a possible suspect, Officer Santiago retrieved a prior booking photo of defendant on the computer in his patrol car. Santiago asked H.B. to look at the photo. H.B. identified defendant from the photo as the first assailant wearing the red hoodie. According to Santiago, H.B. stated that he had seen defendant in the area of the house on Convery Boulevard before the robbery, although H.B. did not know defendant's name. At the later pretrial hearing, H.B. estimated that he had seen defendant approximately five times previously in a five-month period.

The Investigation and Arrest Warrant

On July 2, 2013, H.B. went to Perth Amboy police headquarters to view a photo array containing the images of six African-American men, including the booking photo of defendant

_____

[4] It appears from the record that Reid did not describe the gun.

A-0985-17T3

that Santiago had shown to H.B. on the night of the robbery. H.B. picked out the photo of defendant as the robber. He later testified at the pretrial hearing that he was "a hundred percent" sure he had correctly picked out the man who had robbed him. H.B. was unable to identify the other two people involved in the robbery.

As a result of these events, a judge in Middlesex County issued a warrant for defendant's arrest on the robbery.[5]

Defendant's Arrest and The Premises Search in Asbury Park

On July 3, 2013, Perth Amboy police distributed a "Be On the Look Out" ("BOLO") bulletin, alerting law enforcement that defendant was reported to be a member of a gang and had been linked to a robbery involving a semiautomatic handgun. A police officer in Monmouth County noticed the BOLO bulletin, and discovered that defendant had a recorded address on 6th Avenue in Asbury Park.

Five days after the robbery, on July 5, 2013, Asbury Park police officers went to the 6th Avenue address to see if they could find defendant and take him into custody on the Middlesex arrest warrant. The officers found defendant there hiding inside a closet, and arrested him. The officers searched the

_____

[5] The appendices on appeal do not contain a copy of the warrant or indicate when it was issued.

home and discovered two firearms, one of which was a silver or gray-colored, semiautomatic .45 caliber gun, as well as a shoulder holster and hollow-nosed bullets. They further noted a child was present in the dwelling.

The Monmouth County Indictment

On October 22, 2013, a grand jury in Monmouth County returned Indictment 13-10-1884, charging defendant with various offenses, mainly firearms possessory crimes. Specifically, the Monmouth indictment charged defendant with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count one); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count two); third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3) (count three); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count four); third-degree receiving stolen property, N.J.S.A. 2C:20-7(a) (count five); fourth-degree possession of a prohibited weapon, N.J.S.A. 2C:39-3(f) (count six); and two second-degree "certain persons" not to have weapons offenses, N.J.S.A. 2C:39-7(b)(1) (counts seven and eight). All of these Monmouth County charges stemmed from the search of the home in Asbury Park, where defendant had been found on July 5, 2013.

The Middlesex County Indictments

On February 28, 2014, grand jurors in Middlesex County returned Indictment No. 14-02-0224, charging defendant with: second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1 (count one); first-degree armed robbery, N.J.S.A. 2C:15-1 (count two); third-degree unlawful possession of a "silver colored handgun" without a permit, N.J.S.A. 2C:39-5(b) (count three); and second-degree possession of a "silver colored handgun" for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four). On the same day, grand jurors in Middlesex returned a related second indictment, Indictment No. 14-02-0234, charging defendant with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b).

Resolution of the Monmouth Charges

Defendant filed a motion in Monmouth County to suppress the guns, shoulder holster, and bullets the police had seized from the Asbury Park residence. A judge in Monmouth County denied that motion in March 2014.[6] Having lost the suppression motion, defendant entered into plea negotiations with the Monmouth County Prosecutor's Office.

_____

[6] The suppression motion denial was appealed to this court. That matter (A-5430-14) was amicably resolved by the parties, and the appeal was accordingly dismissed with prejudice in April 2018.

A-0985-17T3

The negotiations resulted in an agreement in which defendant pled guilty to two counts of unlawful possession of a weapon (counts one and four), and one of the "certain persons" charges (count seven), with the Monmouth prosecutor agreeing to dismiss the remaining counts of the indictment. The plea was accepted before a Monmouth County judge on April 6, 2015. Consistent with the plea agreement, defendant was sentenced in Monmouth County on June 5, 2015 to an aggregate custodial term of seven years, subject to a five-year period of parole ineligibility.

The Middlesex County Proceedings

The trial court in Middlesex County thereafter conducted a pretrial evidentiary hearing in April 2017 on H.B.'s out-of-court identification of defendant as one of the armed robbers. Following that hearing, the Middlesex County judge ruled that the identification was proper and admissible under the standards of United States v. Wade, 388 U.S. 218 (1967), State v. Henderson, 208 N.J. 208 (2011), and State v. Chen, 208 N.J. 307 (2011).

Meanwhile, however, the Middlesex judge raised with counsel, sua sponte, the issue of whether defendant's prosecution in Middlesex County could lawfully proceed in light of defendant's earlier plea and sentencing in Monmouth County.

A-0985-17T3

Thereafter, defendant moved to dismiss the Middlesex County indictments, arguing that the Monmouth County disposition precluded his prosecution for armed robbery and the other offenses in Middlesex.

After hearing oral argument, the trial judge ruled that the Middlesex County charges had to be dismissed in their entirety because of their relationship to the weapons charges that had resulted in the judgment of conviction in Monmouth County. In a detailed written opinion (which also included the court's disposition on the identification issues), the judge concluded that principles of mandatory joinder and double jeopardy required the Middlesex and Monmouth charges to have been brought together in a common prosecution.

Among other things, the judge determined that the charged offenses in both counties fundamentally were based on a common criminal episode. He found that the guns police had seized in Asbury Park logically included the same silver gun that the victim H.B. had seen the robber brandish five days earlier in Perth Amboy, noting that the State's pretrial memorandum espoused such a linkage.

The judge observed the State could have avoided the joinder and double jeopardy problems by either including the armed robbery charges in the Monmouth prosecution, or by Monmouth

foregoing its prosecution and forwarding its investigatory file to the Middlesex prosecutors. Although the judge recognized it was unfortunate that defendant receive a "windfall" from the lack of coordination of the two prosecutions, he determined that dismissal of the Middlesex charges was required under the applicable law, so that defendant would not "be prosecuted twice for the same guns." The State moved for reconsideration, which the court denied.

This appeal by the State ensued.[7]

## II.

As we approach the issues presented on appeal concerning the court's dismissal of the Middlesex indictments, we bear in mind dual aspects of the pertinent standards of appellate review. In general, "the decision whether to dismiss an indictment lies within the discretion of the trial court . . . ." State v. Hogan, 144 N.J. 216, 229 (1996) (citing State v. McCrary, 97 N.J. 132, 144 (1984)). "A trial court's

---

[7] Defendant attempted to file a belated cross appeal as within time, challenging the trial court's ruling that the victim's out-of-court identification was admissible. By order, this court denied defendant's motion to file the untimely cross appeal, noting the State's appeal was accelerated and its merits brief had already been filed. However, we preserved defendant's ability to challenge the trial court's interlocutory identification ruling on direct appeal, in the event the Middlesex indictment were reinstated and he were ultimately convicted.

exercise of this discretionary power will not be disturbed on appeal 'unless it has been clearly abused.'" State v. Saavedra, 222 N.J. 39, 55-56 (2015) (citing State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994) (quoting State v. Weleck, 10 N.J. 355, 364 (1952))).

Even so, where, as the State argues here, the trial court's decision does not simply involve the exercise of discretion but instead concerns an alleged misapplication of the law, we must examine those legal contentions de novo without affording the court special deference. State v. Miles, 229 N.J. 83, 90 (2017) (applying de novo review to legal issues of double jeopardy and joinder, arising in the context of reviewing a trial court's ruling on a motion to dismiss an indictment). "When an appellate court reviews a trial court's analysis of a legal issue, it does not owe any special deference to the trial court's legal interpretation." Ibid. (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Indeed, as the Court reaffirmed in Miles, "When a question of law is at stake, the appellate court must apply the law as it understands it." Ibid. (quoting State v. Mann, 203 N.J. 328, 337 (2010)).

Specifically, the State asserts the court below misapplied the law in ruling that, by virtue of the earlier disposition on

the Monmouth charges, the prosecution of defendant on the Middlesex charges is precluded in its entirety by legal principles of mandatory joinder and double jeopardy. We consider these legal issues in turn.

A.

We begin with mandatory joinder, a concept that is more stringent than double jeopardy principles in disallowing certain successive prosecutions. State v. Veney, 409 N.J. Super. 368, 383 (App. Div. 2009) (explaining how the breadth of the prohibitions imposed by our State's mandatory joinder rule exceeds the protections constitutionally afforded to criminal defendants under the Double Jeopardy Clause); see also Cannel, New Jersey Criminal Code Annotated, comment 11 on N.J.S.A. 2C:1-8 (2018) (observing "the [mandatory joinder] requirement is more broadly stated than the tests for either merger or double jeopardy, so that it encompasses situations where neither of those concepts need finally be applicable").

Rule 3:15-1(b) on mandatory joinder, which our State first adopted in 1977, presently reads as follows:

> Except as provided by R. 3:15-2(b),[8] a defendant shall not be subject to separate trials for multiple criminal offenses based

---

[8] There is no claim that the exception in Rule 3:15-2(b), which concerns severance and other relief, applies to the present case.

14

> on the same conduct or arising from the same
> episode, if such offenses are known to the
> appropriate prosecuting officer at the time
> of the commencement of the first trial and
> are within the jurisdiction and venue of a
> single court.
>
> [R. 3:15-1(b) (emphasis added).]

The Legislature codified these principles from the court rule by including a companion mandatory joinder provision, N.J.S.A. 2C:1-8(b), within the Code of Criminal Justice in 1978. The language in N.J.S.A. 2C:1-8(b) tracks the terms of Rule 3:15-1(b). The Code's mandatory joinder provision is implemented through N.J.S.A. 2C:1-10(a)(2), which provides:

> A prosecution of a defendant for a violation
> of a different provision of the statutes or
> based on different facts than a former
> prosecution is barred by such former
> prosecution under the following
> circumstances:
>
> a. The former prosecution resulted in an
> acquittal or in a conviction as defined in
> section 2C:1-9 and the subsequent
> prosecution is for:
>
> . . . .
>
> (2) Any offense for which the defendant
> should have been tried on the first
> prosecution under section 2C:1-8 unless the
> court ordered a separate trial of the charge
> of such offense . . . .
>
> [N.J.S.A. 2C:1-10(a)(2) (emphasis added).]

The term "conviction" is defined in N.J.S.A. 2C:1-9(c) as follows:

> There is a conviction if the prosecution
> resulted in a judgment of conviction which
> has not been reversed or vacated, a verdict
> of guilty which has not been set aside and
> which is capable of supporting a judgment,
> or a plea of guilty accepted by the court.
> In the latter two cases failure to enter
> judgment must be for a reason other than a
> motion of the defendant.
>
> [N.J.S.A. 2C:1-9(c) (emphasis added).]

Here, there is no dispute that defendant's April 2015 guilty plea in Monmouth County, which was followed in June 2015 by his sentencing and the entry of judgment, comprises an eligible "conviction" for purposes of the mandatory joinder analysis.

These mandatory joinder provisions derive from the Supreme Court's opinion in State v. Gregory, 66 N.J. 510 (1975), one of the main cases cited in the parties' briefs in this appeal. The circumstances in Gregory involved a defendant's sale of one glassine envelope of heroin to an undercover police officer in an apartment. Id. at 511. The defendant retrieved the single envelope of heroin from a stash of similar envelopes in the apartment's bathroom medicine cabinet. Ibid. Initially, the State prosecuted and convicted Gregory of only the drug sale. Id. at 511-12. Later, the State charged, prosecuted, and convicted him of possession and possession with intent to distribute the drugs stored in the medicine cabinet. Id. at 512.

The Supreme Court in Gregory vacated the defendant's conviction on the second indictment for possession with intent to distribute, concluding that it was unfair to him for the State to prosecute him for that offense, having already convicted him of the related drug sale. Id. at 522-23. The Court recognized that constitutional principles of double jeopardy might not protect the defendant from the second prosecution, depending upon how broadly one conceives of the criminal "transaction(s)" involved. Id. at 517-18. Nonetheless, the Court disallowed the successive prosecution based on non-constitutional principles of fairness and the defendant's reasonable expectations. Id. at 518.

The Court concluded that the State should have joined the possessory charge in the same indictment and prosecution as the drug sale charge. Id. at 523. As the Court noted, "While the sale of the small quantity [of drugs] and the continuing possession of the larger quantity may under our case law be viewed here as separate offenses, surely the occurrences in their entirety at the defendant's apartment on [the date of the arrest] involved the same conduct or the same criminal episode for purposes of procedural joinder." Id. at 522 (emphasis added).

A-0985-17T3

Following its opinion in <u>Gregory</u>, the Court adopted <u>Rule</u> 3:15-1(b) as a means to implement these concepts of procedural joinder. The Court has interpreted the Rule to encompass four factors a defendant must show to gain dismissal of an indictment on this basis: (1) the multiple offenses must all be criminal; (2) the offenses must be based on either the same conduct or must have arisen out of the same episode; (3) the appropriate prosecuting officer must have known of all of the offenses at the commencement of the first trial; and (4) the offenses must be within the jurisdiction and venue of a single court. <u>State v. Yoskowitz</u>, 116 N.J. 679, 701 (1989).

In the present matter, the State concedes that factors one (multiple criminal charges) and three (knowledge by the Middlesex prosecutor of all of the offenses) are present. The parties' dispute and the legal analysis turns only on factors two (the "same conduct" or "same episode") and four (ability to prosecute the offenses within a common jurisdiction and venue).

The pivotal terms "same conduct" and "same episode" in factor two are not defined in <u>Rule</u> 3:15-1(b) or the companion statute. However, the Court's case law has illuminated the meaning of those concepts. In particular, defendant highlights the Court's opinion in <u>State v. Williams</u>, 172 N.J. 361 (2002), a case the trial court relied upon in its own opinion.

A-0985-17T3

Williams arose out of circumstances in which an undercover police officer purchased drugs from the defendant. Id. at 364. After the drug sale, the defendant rode away on a bicycle. Ibid. Approximately six minutes later, a narcotics surveillance team apprehended the defendant, within only steps of the same set of buildings where the drug sale took place. Id. at 372. As the defendant rode away, police saw him remove an item from his pocket and throw it to the ground. The item turned out to be a glassine bag containing smaller bags of cocaine. Id. at 364. The officers searched the defendant and found the marked twenty-dollar bill used by the undercover officer to buy the drugs minutes earlier. Id. at 365.

The State indicted Williams and charged him with possession of cocaine and resisting arrest. Ibid. He pled guilty to one count of the indictment. Ibid. About two weeks before his sentencing, a second indictment was issued, charging him with drug possession and distribution of cocaine in connection with the undercover officer's purchase. Ibid.

The trial court denied the defendant's motion to dismiss the second indictment under the mandatory joinder rule. Id. at 366. However, the Supreme Court reversed that disposition, concluding that all four required factors under the Rule were established. Id. at 368, 372. In particular, the Court

reasoned that the conduct charged in both indictments was part of the same "episode," given that the short time and distance between the occurrence of the offenses was "virtually inconsequential." Id. at 372. Moreover, the Court noted that a reasonable assessment of the defendant's actions reflected an overall scheme to sell drugs and to avoid arrest for that sale when he fled immediately from the approaching police. Ibid. The Court concluded that the defendant's "purpose and actions were all part of the same criminal event and should not be subjected to fine sequential parsing that results in an unreasonable second prosecution . . . ." Ibid.

The trial court likened the present circumstances to those in Williams. It treated the offenses charged against defendant collectively in the Monmouth and Middlesex indictments as all being part and parcel of a singular criminal episode. Subject to several caveats that we will explain, we respectfully differ with the trial court's legal conclusion, with regard to the armed robbery and conspiracy charges.

The analysis of the "same episode" factor in this matter is largely informed by concepts of "continuing wrongs" in criminal law. The Court alluded to this concept in its seminal opinion in Gregory, 66 N.J. at 522, in ruling that the defendant's "continuing possession" of the larger quantity of drugs, after

20                                                    A-0985-17T3

he had just sold a smaller amount to the undercover officer, concerned the same overall criminal episode.

The Court most recently explained the conceptual distinction between continuing wrongs and independent criminal offenses in State v. Diorio, 216 N.J. 598 (2014). Although that case involved the applicable statute of limitations for successive acts of theft, the Court's general guidance about continuing wrong concepts is instructive, if not directly controlling, here. Specifically, the Court held that where a defendant takes part in an ongoing scheme to obtain another person's property by means of deception, the crime of theft-by-deception is a continuing offense. Id. at 617-18. If the scheme involves a defendant's promise to pay the victim for the property at a later date, the crime continues until the date for expected payment has passed. Id. at 621-22. By comparison, the crime of money laundering would not be a continuous offense unless there is evidence of successive acts that facilitate the common scheme to defraud. See id. at 627-28.

N.J.S.A. 2C:1-6(c) declares that "[a]n offense is committed either when every element occurs or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated." Accordingly, the Court in Diorio

21

observed that our Criminal Code thereby conveys a general "'presumption against finding that an offense is a continuous one.' II <u>The New Jersey Penal Code, Final Report of the N.J. Criminal Law Revision Commission</u> § 2C:1-6 commentary 2 at 15 (1971)." <u>Diorio</u>, 216 N.J. at 614-15. "However, the Code expressly recognizes the existence of continuing offenses, N.J.S.A. 2C:1-6(c), and the Law Revision Commission declared that '[t]o the extent that a given offense does in fact proscribe a continuing course of conduct, no violence is done to the statute of limitations.'" <u>Id.</u> at 615 (quoting the Commission Report at 16). In determining whether the general presumption against continuous offenses is surmounted, the Court's "task then is to determine whether the Legislature explicitly declared [the subject] offenses as continuing offenses or [whether] the nature of either offense is one that the Legislature must have intended that it be treated in this manner." <u>Id.</u> at 615-16.

The Court in <u>Diorio</u> explained the concept of a continuing wrong with the following language and illustrations. Notably for our present case, the Court's illustrations include the crime of robbery, as well as firearms possessory crimes.

> A criminal offense is often classified as either a discrete act or a continuing offense. "<u>A discrete act</u>" is one that occurs at a single point in time. <u>State v.</u>

> Williams, 129 N.J. Super. 84, 86 (App. Div. 1974), rev'd on other grounds, 68 N.J. 54 (1975). Robbery is such an offense.
>
> [Diorio, 216 N.J. at 614 (emphasis added).]

By contrast to "discrete" offenses such as robbery, the Court defined a "continuing offense" as follows:

> A continuing offense involves conduct spanning an extended period of time and generates harm that continues uninterrupted until the course of conduct ceases. State v. Ireland, 126 N.J.L. 444, 445 (Sup. Ct. 1941), appeal dismissed, 127 N.J.L. 558 (E. & A. 1942).
>
> [Ibid. (emphasis added).]

The Court then presents the following examples of continuing offenses, including the uninterrupted possession of an unlawful item such as a firearm:

> For example, possession of a controlled substance is considered a continuous offense. No New Jersey case holds that separate days of continuous criminal possession will support separate convictions. Cannel, New Jersey Criminal Code Annotated, comment 8 on N.J.S.A. 2C:1-8 (2013); see also United States v. Fleischli, 305 F.3d 643, 658 (7th Cir. 2002) (holding that possession of firearm is considered continuing offense which ceases only when possession stops). On the other hand, separate instances of possession of a banned substance are discrete acts. Williams, 129 N.J. Super. at 86. Kidnapping is considered a continuing offense because the risk of harm to the victim persists until safe release. United States v. Garcia, 854 F.2d 340, 343-44 (9th Cir. 1988).

[Ibid. (emphasis added).]

Guided by the Court's examples, we proceed to consider the five counts of the Middlesex indictments. The most serious of those charged offenses is first-degree armed robbery, N.J.S.A. 2C:15-1. We also consider at the same time the associated count charging second-degree conspiracy to commit armed robbery, N.J.S.A. 2C:5-2 and 2C:15-1.

As the Court made clear in Diorio, the offense of robbery is a discrete act that is completed at the time of the forcible taking itself. Id. at 614. Here, the robbery was completed when defendant, as the State alleges, threatened the victim H.B. with immediate bodily injury (or placed him in fear of such harm) while armed with a deadly weapon, and committed a theft of his property, i.e., H.B.'s money and car keys. N.J.S.A. 2C:15-1.

Although the crime of conspiracy conceptually is a continuing wrong, the duration of a conspiracy generally terminates "when the crime or crimes which are its object are committed or the agreement that they be committed is abandoned by the defendant and by those with whom he conspired . . . ." N.J.S.A. 2C:5-2(f)(1). The Court has recognized exceptions to that principle, such as the notion that concerted acts undertaken in concealment of a crime that was the conspiracy's

main objective can serve to continue the conspiracy. <u>State v.</u> <u>Savage</u>, 172 N.J. 374, 405-06 (2002); <u>see also</u> <u>State v. Cagno</u>, 211 N.J. 488, 511 (2012).

Here, the existing record does not contain any indication that the alleged conspiracy to rob the victim was extended by concerted acts of defendant and others after the victim H.B. was accosted on the street in Perth Amboy. Given the present absence of such indicia of continuation of the conspiracy, we are persuaded that both the armed robbery offense and the conspiracy-to-rob offense were discrete crimes that appear to have been completed on June 30, 2013, and did not continue through to the time of defendant's arrest in Asbury Park five days later.[9]

The trial court nonetheless regarded defendant's possession of the two guns, the bullets, and the shoulder holster in Asbury Park on July 5, 2013 as part of the same "episode" as the robbery committed five days earlier. A critical premise of the court's reasoning, which it expressed multiple times in its written decision, was that the guns found at the Asbury Park

---

[9] We do not foreclose the State from developing proofs that a conspiracy continued after June 30, but such evidence might prompt judicial reconsideration of whether such evidence of continuation affects the mandatory joinder analysis respecting the conspiracy count. We note that the Middlesex indictments do not charge defendant with eluding or hindering apprehension, offenses which would involve a different continuity analysis.

residence included the same "silver-colored" or "gray-colored" firearm described by H.B. as the one defendant had pointed at him. The State contests that premise, arguing that it has not definitively claimed that the gun used in the robbery was one of the guns seized from the Asbury Park residence.

The trial court rightly took the State to task for its ambivalent and inconsistently-stated positions on this key factual point, as expressed in the State's January 28, 2016 pre-trial memorandum for the Middlesex case. On page 8 of that memo, the State is non-committal on the subject, asserting in hedged language that "the State is <u>not</u> attempting to prove that the guns recovered during defendant's arrest were <u>necessarily</u> used in the robbery of [H.B.]." (Emphasis added). The memorandum then states that:

> Instead, the guns would be admitted as circumstantial evidence. <u>At no point will the State</u> [at the Middlesex trial] <u>indicate</u> that the two guns recovered <u>were used</u> in the robbery. Rather, the State should be permitted to <u>argue</u> the guns were <u>possibly used</u> in the robbery. As a result, the guns are relevant and admissible evidence.
>
> [(Emphasis added).]

Despite these confusing attempted disclaimers on page 8, the State's pre-trial memo later argues on page 13 that the guns and the holster found at the Asbury Park home are admissible as relevant proof of defendant's identity as the robber under

N.J.R.E. 404(b) (prior acts) and, by inference, N.J.R.E. 401 (relevancy). The memo asserts in this regard:

> [T]he evidence [of the seized guns and holster] is not being offered to prove defendant's propensity to commit crimes, but rather <u>to establish that he is the person who committed the instant [armed robbery] offense</u>. Admission of other crimes evidence <u>to establish identity</u> is proper under N.J.R.E. 404[(]b[)]. As stated above, the guns will be <u>circumstantial evidence to prove that defendant was the person who committed the robbery</u>. That defendant was found in possession of <u>a handgun that fits the description of the one used in the robbery</u> just days after the robbery is circumstantial evidence that defendant committed the robbery.
>
> [(Emphasis added).]

The State cannot have it both ways. Either it is claiming that the guns seized at the residence included the same one(s) used in the robbery, or it isn't. If the former, then its claim of common weaponry undermines its argument against mandatory joinder, and aids defendant's argument that the guns he possessed in Asbury Park are part of the same overall criminal "episode." If the latter, then the State should not be permitted to sidestep the joinder problem by asserting at pre-trial motions and on this appeal an insufficient nexus between the robbery and the seized guns, but suggest later to a jury at a trial that the guns are "possibly" the same ones and therefore help prove that defendant is indeed the robber. Like any other

litigant, the State is estopped from taking inconsistent positions that are relied upon by the tribunal. See, e.g., State v. Roach, 146 N.J. 208, 222 (1996) (recognizing that general principle, but concluding from the circumstances that the prosecution's inconsistent factual arguments it made in different proceedings nonetheless did not prejudice the defendant); McCurrie ex rel. Town of Kearny v. Town of Kearny, 174 N.J. 523, 533-34 (2002) (applying judicial estoppel against a governmental entity that had asserted contrary positions at different phases of the case).

The trial court construed the State's ambivalent memo to be a definitive claim that the seized guns and holster had, in fact, been used in the robbery. We stop short of doing that, although we agree with the court that appears to be a reasonable inference.

In any event, we do not believe it would be fair to defendant to allow the State to continue to be non-committal or inconsistent. If the State wishes, as we presume it does, to pursue the robbery and conspiracy charges at trial, then it must forbear from arguing, suggesting, or intimating to the jury that the guns, holster, and bullets seized in Asbury Park are the same ones — or even "possibly" the same ones — used in the robbery. Nor can the State advocate that the seized weaponry is

28

proof of defendant's "identity" as the robber. Instead, the State would have to rely on other evidence in the record, in particular, the eyewitness testimony and the victim's description of what had been pointed at him, to establish the elements of armed robbery and conspiracy.

We believe the foregoing analysis is consistent with the Court's decisions in Gregory and Williams, which were focal points of the parties' briefs. With respect to the robbery and conspiracy charges, we believe the five-day gap of time and the physical distance between Perth Amboy and Asbury Park sufficiently attenuate those Middlesex crimes from the possessory crimes in Monmouth to allow them to be treated as distinct offenses that can be prosecuted separately. The context here is unlike the situation in Gregory where the undercover sale of drugs charged in the first indictment was closely connected to the drug possession offenses charged in the second indictment. The circumstances in Williams, involving a mere six-minute interval between the undercover purchase and the defendant's apprehension a short distance away in the same vicinity, also are dissimilar from the asserted link between the June 30 robbery and the July 5 possessory offenses in a different county.

The fact that defendant was apprehended in Monmouth on an arrest warrant issued in Middlesex does not mean the two prosecutions inexorably stem from the same episode. If that were the case, a fugitive arrested on a warrant from another county who has been engaged in new offenses at his present location might be able to thwart the ability of the two counties to proceed efficiently and independently with separate prosecutions for the discrete acts committed in their respective locales. The joinder rules should not hinder law enforcement in apprehending fugitives who are wanted for crimes committed elsewhere, and in prosecuting them for new criminal acts performed within their own jurisdictions.

The "same episode" analysis differs with respect to the three firearms possession counts in the Middlesex indictments. Two of those charges — the "certain persons" offense in Indictment No. 14-02-0234, N.J.S.A. 2C:39-7(b), and the unlawful possession of a weapon offense set forth in count three of Indictment No. 14-02-0224, N.J.S.A. 2C:39-5(b), replicate possessory crimes that were also respectively charged in counts four, seven, and eight in the Monmouth indictment. The other firearms possession offense charged in Middlesex, i.e., possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), count three of Indictment No. 14-02-0224, has no

corresponding parallel in the Monmouth indictment. We are also mindful that defendant pled guilty to one of the "certain persons" counts in Monmouth, and a portion of his aggregate sentence relates to that offense.

As the Supreme Court made clear in Diorio, echoed by the Commentary in the Cannel treatise and the cited federal case law involving firearms possession, "No New Jersey case holds that separate days of continuous criminal possession will support separate convictions." 216 N.J. at 614 (emphasis added). Only "separate instances of possession of a banned substance are discrete acts." Ibid. (emphasis added). See also Fleischli, 305 F.3d at 658 (observing that "[p]ossession of a firearm is a continuing offense which ceases only when the possession stops") (citing United States v. Ballentine, 4 F.3d 504, 507 (7th Cir. 1993)).

Following this logic, defendant's alleged possession of the weaponry on June 30 during the armed robbery ordinarily would be deemed a continuing possessory offense, through and including the time that he was found, along with the weaponry, five days later on July 5. As such, we have no difficulty in treating those possessory crimes, as the trial court did, as being part of the "same episode" for purposes of mandatory joinder analysis.

A-0985-17T3

We insert a caveat, however. The continuing offense of possession of an illegal item ceases when a defendant relinquishes possession of the item, even if he reacquires it at a later time. The sparse present record contains no indication that defendant stashed or otherwise ceased possessory control of the weapons at some point in the five-day interval between the June 30 robbery and his July 5 arrest. Based on the limited record before us, it appears that the trial court correctly treated the possessory crimes as all being encompassed within the same episode. However, we modify the court's decision to leave the State an opportunity to move to reinstate the possessory charges in Middlesex if it can proffer such proof of a break in the chain of continuous possession. Otherwise, those counts must remain dismissed.

We lastly turn to the final element of the four-part mandatory joinder test, i.e., venue and jurisdiction. This factor is easily met. The trial court correctly ruled that both Middlesex and Monmouth Counties have statewide criminal jurisdiction, and that either forum could have served as a venue for a combined prosecution, subject to any severance motion that defendant might have chosen to make. State v. James, 194 N.J. Super. 362, 365-66 (App. Div. 1984). The joinder analysis does not turn on this fourth prong. Instead, as we have shown, the

32

analysis hinges on the second prong concerning whether the "same episode" test is met. As noted, that analysis leads to reinstatement of at least the armed robbery and conspiracy charges.

B.

Having delved into the mandatory joinder issues in depth, we need not comment at length about double jeopardy issues, which are governed by less stringent legal standards. The following brief discussion will suffice.

The Federal and State Double Jeopardy Clauses provide that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const. amend. V, and "[n]o person shall, after acquittal, be tried for the same offense," N.J. Const. art. I, ¶ 11. As our Supreme Court recently explained in its May 16, 2017 opinion in State v. Miles, 229 N.J. 83, 99 (2017), until Miles was decided, our state has construed the double jeopardy clause to bar, subject to exceptions, a successive prosecution where the later prosecution is based on the "same-evidence" as the first prosecution. Going forward, the Court advised in Miles that our courts should cease using the "same-evidence" test and instead apply the "same-elements" test utilized under the federal case law. Id. at 94-

96. See United States v. Dixon, 509 U.S. 688, 708-09 (1993) (utilizing the "same-elements" test).

Because this matter arose and the joinder motion was adjudicated in the trial court before May 16, 2017, we are guided by the former "same-evidence" test for double jeopardy purposes. Applying that test, it is readily apparent that the possessory weapons charges set forth in the Middlesex indictment[10] would need to be proven by different evidence than the evidence the State needed to prove the charges in the Monmouth indictment. Those counts of the Middlesex indictment would fundamentally turn upon the credibility of the eyewitness testimony observing that defendant illegally possessed a gun in Perth Amboy on the specific date of June 30, 2013. The evidence obtained five days later in Asbury Park on July 5, 2013 would not be essential to the Middlesex firearms possession charges, nor would it be sufficient. The evidence in Middlesex on those charges would invariably have to go beyond the Monmouth evidence. Accordingly, no double jeopardy violation is present.

III.

To sum it up, we affirm the trial court's ruling to dismiss the firearms possessory charges (counts three and four of

---

[10] Defendant confines his double jeopardy arguments to those counts, and does not argue that the armed robbery and conspiracy counts are vulnerable to dismissal on this basis.

Middlesex Indictment No. 14-02-0224 and count one of Indictment No. 14-02-0234), without prejudice to the State moving to reinstate those counts upon a proffer of evidence of a break in continuity of defendant's possession. We reverse the court's dismissal of the armed robbery (count two) and conspiracy (count one) charges in Middlesex Indictment No. 14-02-0224, subject to the caveat we have expressed prohibiting the State from asserting or suggesting to the jury that the weaponry seized in Monmouth County included weapons used earlier in the robbery. The matter is remanded for trial subject to these various conditions.

Affirmed in part as modified, reversed in part, and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0985-17T3