JUSTICE TIMPONE delivered the opinion of the Court.
**141 In this appeal, we consider whether defendant Andrew J. Fede violated the criminal obstruction statute, N.J.S.A. 2C:29-1(a), when he refused to remove the chain lock from the door to his home and allow warrantless entry by police officers who were responding to a report of potential domestic violence.
We stress that the police officers had the right to enter defendant's home under the emergency-aid doctrine, which permits warrantless entry under circumstances like those presented in this case. Because defendant's refusal to remove the door chain did not constitute an affirmative interference for purposes of obstructing justice within the meaning of the obstruction statute, we reverse **142 the judgment of the Appellate Division and vacate defendant's conviction.
I.
A.
We glean the following facts from the record. On the evening of March 16, 2014, two police officers from the Cliffside Park Police Department were dispatched to a multi-family building on Palisades Avenue in response to a call reporting a potential domestic violence situation. Patrol Officer Zoklu and Sergeant Becker of the Cliffside Park Police Department were the first to arrive at the building. Neither officer observed any commotion. In consultation with the dispatcher, they learned the reported domestic altercation was coming from apartment number three. The officers knocked on the door of apartment three -- defendant Andrew Fede's apartment. Defendant partially opened the door, which was secured with a chain lock. The officers and defendant could see one another.
The officers identified themselves, told defendant they were investigating a domestic disturbance, and sought entry into his home to check on the well-being of the occupants. During the initial stages of their conversation, the officers learned that defendant lived with Stephanie Santiago. Defendant explained that she was away in South Carolina and he was alone in the apartment. Defendant insisted that *1284 the officers were at the wrong location. The officers requested entry to verify defendant's assertions. He refused.
As the conversation continued, the situation became more contentious. Defendant asked if they had a warrant. The officers explained they were acting under the community-caretaking doctrine and were permitted to enter his home without a warrant to ensure the welfare of the occupants. Defendant demanded a warrant. He remained by the door in view of the officers, refusing to unchain his lock.
**143 In an effort to defuse the situation, the officers gave defendant the telephone number of their supervisor. Fede called and spoke to the supervisor, who confirmed the officers' reason for seeking entry. The supervisor explained to Fede that the officers were responding to a report of domestic violence inside his home, that they sought entry into the home to conduct a welfare check, and that once they checked the home to verify that no one had been injured, the officers would be on their way. Despite attempts to reason with Fede for well over twenty minutes, the officers were unable to convince him to unchain his door. Defendant later explained that he was exercising his Fourth Amendment rights and that he always kept the chain lock engaged when he answered the door. Fede also threatened to sue the police officers if they broke the chain to enter.
Concerned about the possibility of domestic violence, the officers broke the chain lock on Fede's door and entered his apartment. The entry was uneventful, and after being instructed to move into the building's hallway, Fede stepped outside of his apartment and stood next to Zoklu as other officers searched the home. The search confirmed that defendant was alone in the apartment. The officers thereafter placed Fede under arrest for obstruction of the administration of the law under N.J.S.A. 2C:29-1(a) for failing to remove the chain lock from his door.
B.
On February 12, 2015, a bench trial was held in the Cliffside Park Municipal Court. The court heard testimony from Officer Zoklu, Stephanie Santiago -- defendant's roommate -- and defendant. At trial, Zoklu recounted the events leading to Fede's arrest. In all material respects, Fede's testimony was similar to Zoklu's.
The trial court found the officers had an objectively reasonable basis to enter Fede's apartment given the report of domestic violence and that Fede had a legal obligation to admit officers into his home. The court found Fede's refusal to unchain his lock so the officers could enter the apartment constituted an obstacle for **144 purposes of N.J.S.A. 2C:29-1(a) and fined him $200 plus court costs.
C.
On Fede's first appeal, a Law Division judge affirmed defendant's conviction in an opinion dated September 21, 2015. Recognizing that "[a] necessary element of [ N.J.S.A. 2C:29-1 ] requires defendant to have affirmatively taken some action to physically interfere, or place an obstacle, to prevent the police from performing their official function," the court nevertheless concluded that because defendant had "purposely prevented" officers from gaining entry into his home by "refusing to unchain his door," he "creat[ed] an obstacle, which prevented the police from performing their official function." The court justified the responding officers' warrantless entry onto defendant's premises under the emergency-aid doctrine.
D.
On further appeal to the Appellate Division, the panel affirmed the Law Division's *1285 holding, additionally relying on our decision in State v. Reece, 222 N.J. 154, 117 A.3d 1235 (2015) (finding a defendant guilty of obstruction for closing his entry door when police officers attempted entry into the defendant's home).
We granted Fede's petition for certification. 232 N.J. 412, 180 A.3d 723 (2018).
II.
A.
Fede urges us to reverse the Appellate Division decision, arguing that unlike the defendant in Reece, Fede took no affirmative act to obstruct the police from fulfilling an official obligation.
**145 B.
The ACLU largely echoes defendant's position by arguing that Fede's refusal to permit a warrantless search of his home cannot give rise to criminality for obstruction. The ACLU notes the record is devoid of any facts that demonstrate Fede physically blocked the police's entry, or that he prevented the officers from breaking the chain lock. Thus, the ACLU concludes Fede's refusal to remove the already secured chain lock from his door simply "maintained the status quo."
C.
The State urges that our jurisprudence and sound public policy favor the affirmance of the Appellate Division's decision, arguing that leaving the chain lock engaged was a category of obstacle that, under the statute, "affirmatively interfered" with the police officers' lawful entry into the home.
D.
The Attorney General hews closely to the State's position, agreeing that Fede created a physical interference or obstacle when he refused to remove the chain lock securing his apartment door. The Attorney General adds that Fede further created an obstacle by standing in the doorway of his apartment with the chain lock engaged, refusing the police entry. Finally, the Attorney General suggests that Fede's purpose in blocking the officers' entry was to prevent their lawful entry under the community-caretaking doctrine.
III.
As a preliminary matter, we consider the appropriateness of the officers' actions in breaking the door's chain lock.
Among their extensive duties, police officers serve a vital community-caretaking role.
**146 State v. Vargas, 213 N.J. 301, 323, 63 A.3d 175 (2013). In this role, they are given the latitude to make warrantless entry into a home under the emergency-aid exception to the warrant requirement. Ibid. (citing State v. Frankel, 179 N.J. 586, 598-99, 847 A.2d 561 (2004) ). This is not an unfettered right. It is "derived from the commonsense understanding that exigent circumstances may require ... police ... to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury." State v. Edmonds, 211 N.J. 117, 130, 47 A.3d 737 (2012) (quoting Frankel, 179 N.J. at 598, 847 A.2d 561 ). High on the list of exigent circumstances is prevention of domestic violence. Our Legislature codified its intent to ensure that complaints of domestic violence should be handled immediately by enforcing the laws and protecting the victim when it enacted the Prevention of Domestic Violence Act of 1991, N.J.S.A. 2C:25-17 to -35.
In Edmonds, we underscored that "[a]llegations of domestic violence, even if coming from a seemingly anonymous source, cannot be breezily dismissed and must be investigated." Id. at 140, 47 A.3d 737. We stressed that "[t]he community-caretaking doctrine is an exception to the warrant *1286 requirement, not a roving commission to conduct a nonconsensual search of a home in the absence of exigent circumstances." Id. at 143, 47 A.3d 737. We simultaneously made clear that the emergency-aid exception to the warrant requirement permitted police to enter a home without a warrant to conduct a welfare check in response to a report of domestic violence inside the home. Id. at 140, 47 A.3d 737. To distinguish roving searches from permissible entries, we established in Edmonds that,
for a warrantless search to be justified by the emergency-aid doctrine, the State must prove only that (1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury and (2) there was a reasonable nexus between the emergency and the area or places to be searched.
[ Id. at 132 (internal quotation marks omitted).]
Where, as here, a report of domestic violence provides the police with an objectively reasonable basis to believe an emergency **147 exists inside the home, a warrantless search is permitted for the limited purpose of ensuring the welfare of the occupants in the home. The police officers at the heart of this matter acted properly and professionally under the emergency-aid doctrine in breaking the chain lock to enter defendant's apartment in order to ascertain the validity of reported allegations of domestic violence within the apartment. Their last-resort breaking of the door's chain lock to gain entry fell squarely within their community-caretaker duties prompted by exigent circumstances.
IV.
Charging defendant with obstruction, pursuant to N.J.S.A. 2C:29-1(a), for refusing to unchain the door lock, however, is a different matter. The police's having the right to enter Fede's home does not lead to the conclusion that Fede's refusal to remove the chain from the lock on his door constituted obstruction within the meaning of the criminal obstruction statute, N.J.S.A. 2C:29-1(a). In determining whether defendant's actions fell within the statute's proscriptions, we examine the terms of the statute in relation to the facts of this case.
A.
Questions of statutory interpretation are legal ones. State v. S.B., 230 N.J. 62, 67, 165 A.3d 722 (2017) (citing State v. Revie, 220 N.J. 126, 132, 104 A.3d 221 (2014) ). Our review of a trial court's legal conclusions is de novo, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995), and "unconstrained by deference to the decisions of the trial court or the appellate panel," S.B., 230 N.J. at 67, 165 A.3d 722 (quoting State v. Grate, 220 N.J. 317, 329, 106 A.3d 466 (2015) ).
Principles of statutory construction guide our analysis of N.J.S.A. 2C:29-1(a). Our primary goal in interpreting a statute is to determine to the best of our abilities "the intent of the **148 Legislature, and to give effect to that intent." Ibid. (quoting State v. Robinson, 217 N.J. 594, 604, 92 A.3d 656 (2014) ). We start with the statute's plain language, giving terms their ordinary meaning. Ibid. If the plain language of a statute is clear, that ends the matter; we then are duty-bound to apply that plain meaning. Kean Fed'n of Teachers v. Morell, 233 N.J. 566, 584, 187 A.3d 153 (2018).
B.
A person violates N.J.S.A. 2C:29-1(a)
if he [or she] purposely obstructs, impairs or perverts the administration of *1287 law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act. This section does not apply to failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.
The statute qualifies what conduct is prohibited -- including obstruction of the administration of law -- by reference to how the activity is carried out -- including by means of "physical interference or obstacle." By the plain and ordinary meaning of the terms of the statute, criminal liability for obstruction stems only from certain modes of behavior.
To violate N.J.S.A. 2C:29-1(a), a person must not only "purposely obstruct[ ], impair[ ] or pervert[ ] the administration of law" but must do so through one of the specifically enumerated acts in the statute, through "physical interference or obstacle," or through an "independently unlawful act." In its second sentence, the statute specifically distinguishes the above behaviors from failures to perform non-official duties and other conduct.
The statute is unambiguous. It defines the explicit means by which one may be criminally liable for obstruction and requires affirmative interference. The statute's second sentence informs interpretation of the statute's meaning overall, namely, that the obstruction statute in its entirety requires as a necessary element an act of affirmative interference. Otherwise, the outer contours of **149 the statute would be difficult to limit. For example, a defendant could be convicted of obstruction for sitting on his couch and declining to respond to the police officer's knock.
Commentary from the Model Penal Code supports the requirement of an affirmative act. N.J.S.A. 2C:29-1 contains similar language to section 242.1 of the Model Penal Code, which exempts from its reach "failure to perform a legal duty" and "any other means of avoiding compliance with law without affirmative interference with governmental functions." Model Penal Code § 242.1 (Am. Law Inst. 1962). As the commentary explains, "[t]he effect of this language is to require some affirmative obstructive act." Id. at cmt. 6.
We hold that to find criminal liability under N.J.S.A. 2C:29-1 requires an affirmative act or some affirmative interference.
C.
We turn to whether Fede's refusal to unchain the lock on his door to permit police to enter his home formed a sufficient factual basis for his conviction under N.J.S.A. 2C:29-1(a).
Fede's refusal to remove the already-fastened chain lock required no physical effort; it was not an act. It would be both counterintuitive and contrary to the plain meaning of the term "affirmative," which requires effort, to find that defendant affirmatively interfered with the police by failing to remove an already-fastened chain lock from his door. Our case law and the statute do not compel a different result.
The appellate panel relied heavily on Reece, but we find the conduct at issue in that case distinguishable from Fede's refusal to unchain his door. In Reece, officers responded after receiving a dropped 9-1-1 call originating from Reece's home. 222 N.J. at 158, 117 A.3d 1235. Officers sought warrantless entry into Reece's home to conduct a welfare check under the emergency-aid doctrine, but Reece refused consent. Id. at 159, 117 A.3d 1235. The *1288 **150 officers explained that they "needed to check the house, at which point [Reece] slammed the door closed" and attempted to lock it. Id. at 159-60, 117 A.3d 1235. "[T]he officers pushed the door open," at which time a violent physical struggle ensued, causing Reece and the three officers to fall to the floor. Id. at 160, 117 A.3d 1235.
In our analysis, we recognized that officers had announced their intention to enter Reece's home and that they were doing so "in order to lawfully perform an official function under the emergency-aid doctrine." Id. at 172, 117 A.3d 1235. Once we established that the officers' warrantless entry was lawful, we concluded that the defendant's attempt to slam and lock the door on the officers in an attempt to prevent the officers from performing their official function constituted obstruction. Ibid. Specifically, we found that Reece attempted to prevent the officers' entry "by means of ... physical interference or obstacle." Ibid. (quoting N.J.S.A. 2C:29-1(a) ).
By the structure and the terms of the obstruction statute, the attempt to create an obstacle is distinct from a failure to act. Here, Fede did not undertake an affirmative act. He did not learn of the officers' need to enter his home and then attempt to prevent that entry. His use of the ordinary door-chain-lock was his standard practice, not a circumstantial reaction to the officers' knock. As the testimony revealed, Fede did not try to prevent the officers from breaking the chain, offering no physical resistance once the officers broke the chain and entered. Indeed, he complied with instructions to wait outside his home while the search was conducted. Although Fede's refusal to remove the lock to allow the officers to perform their necessary, lawful, and focused search is not an advisable course of action and could have escalated the situation, it was not criminal.
The State argues that the failure to remove the lock here was analogous to conduct that we found violative in State v. Lashinsky, 81 N.J. 1, 404 A.2d 1121 (1979). In that case, we addressed a defendant's conviction for disorderly conduct for disobeying an **151 officer's command to leave the scene of a fatal motor vehicle accident. Id. at 5-6, 404 A.2d 1121. The defendant, a photo-journalist, had pulled over to photograph an accident on the Garden State Parkway. Id. at 6, 404 A.2d 1121. Because a crowd had formed and fluids were leaking from the vehicles, a state trooper became concerned for crowd safety. Id. at 6-7, 404 A.2d 1121. After the trooper repeatedly asked the defendant to move back from the scene, the defendant "engaged the trooper in a heated argument," lasting several minutes. Id. at 7, 404 A.2d 1121. The trooper arrested the defendant when "it became quite apparent that the photographer had no intention of removing himself from the scene." Ibid.
On appeal from his conviction, Lashinsky argued that the factual basis for his conviction was improper "because he did not directly, physically interfere with the officer's movement." Id. at 8-9, 404 A.2d 1121. The statute at issue in Lashinsky, N.J.S.A. 2A:170-29(2)(b), made it unlawful for a person to "obstruct, molest or interfere with another person who is lawfully in any place." Id. at 9, 404 A.2d 1121. In affirming Lashinsky's conviction, we found that the language of the statute "[did] not by its express terms import the notion that the prohibited conduct must be physical in nature." Id. at 9, 404 A.2d 1121. We held that Lashinsky's refusal to leave the scene of an accident after being instructed to do so provided a sufficient factual basis for his conviction under the disorderly person statute. Id. at 11-12, 404 A.2d 1121.
The wholly distinct statute at issue in Lashinsky, as well as the very different *1289 context of that case, involving not entry into a home but rather a protective relocation of spectators in a public place, renders Lashinsky inapplicable here.
In sum, N.J.S.A. 2C:29-1(a) clearly states that any means of alleged obstruction other than those explicitly listed must be accompanied by "affirmative interference" to run afoul of the criminal obstruction statute. Here, there was no such "affirmative interference," nor did defendant's failure to remove the chain lock from the door fit into any of the statute's enumerated modes of **152 behaviors. There was thus no factual basis for Fede's obstruction conviction under the circumstances of this case.
V.
Accordingly, we reverse the judgment of the Appellate Division and vacate Fede's conviction.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE'S opinion.